The Commission raised three claims here, one termination claim and two failure to accommodate claims. Looking at the termination claim first and looking at the record, the way the District Court was bound to on summary judgment, there's crediting Soane's testimony and raising reasonable inferences from that favorable to the Commission, and rejecting or ignoring testimony and evidence that her testimony contradicted. The jury, from the evidence the Commission offered, a jury could find that LHC promoted her to team leader in March, that she performed satisfactorily, and in fact that they offered her a promotion. But then after her seizure, things changed radically. Her supervisor, who had been friendly, stopped being friendly and ignored her request for an accommodation. And then on June 19th, Guccaro and Taggart delivered severe criticisms of her performance and conduct, which her testimony shows were in part unfounded, in part misdirected, and then in part disputed. Were these criticisms after the seizure issues that were affecting her, like transportation, not being able to drive, and not being able to do her computer work, or were they general complaints about her work in general not affected by the seizure? Okay. Driving was not raised, but her performance on the computer was raised, and that may have been affected by her meds and the accommodation they did not grant. I'm about to get a complaint from one of the people serviced by the company. I thought there was something about a complaint where one of the people serviced said that they didn't want her to come out anymore. Right. She worked a shift as a field nurse on June 7th, at the end of the week when she came back, and one of the patients said that they did not want her to come back, and she conceded that she was very tired and sleepy that day because of the meds, because her doctor had put her on a more severe regimen of anti-seizure meds than she had been on before. So there's no dispute that this customer didn't want her to come back, and you're saying it was because she was sleepy and tired? That, well, that . . . I mean, she doesn't deny, there's no dispute then that this is a pretext, that somebody did complain about this person servicing them and said they won't come back, and your reply is, well, because she was taking this medicine, she couldn't do the work. Sounds like that bears on whether she's qualified to do her job or not. Well, her job was as team leader, and she occasionally had . . . it's unclear how . . . I think most team leaders did not take shifts as field nurse. Her job was in the office. But she had to be prepared to go out when there was someone absent or something. She did fill in for people that weren't able to make their shifts. It's . . . a jury could conclude from the evidence that team leaders rarely, if ever, had to leave the office, because when she came back, when she came back, the first . . . She had a concession that she wasn't qualified to be a field nurse? Is that . . . No. No. No. It's . . . Well, you're just saying, then, as a team leader, she wouldn't have been required to serve as a field nurse, arguably. Right. Or to visit patients' homes is more . . . she didn't have to travel to patients' homes. But our second failure to accommodate claim is that she could have used the van service to get to patients' homes. Okay. And you mentioned failure to accommodate. And I guess one of my concerns is what legal standards we're applying, what law should apply to this. So, in order to make a claim, she has to establish that she has a disability? Yes. Is that right? Yes. And then that she suffered an adverse employment action as a result of the disability? For the termination claim, yes. All right. For failure to accommodate, she has to establish that she asked for an accommodation, and they either . . . and they unreasonably withheld it, or they fired her without discussing it with her. So, a request for an accommodation means I have a disability, but you're required to make an effort to accommodate me? Yes. All right. And what was her request for accommodation? Well, with respect to the field nurse position, none, because she didn't have an opportunity. I mean, they knew that she had this driving restriction, and they evidently assumed that there was no way they could accommodate her if she could not drive her own car. The nurses that went and made the home visits generally would drive their own car to these different patients that they saw? Yes. That's right. And she supervised several of these nurses in her new role, in her role? Yes. As team leader, yes. But . . . You're getting to my what was her request for accommodation question. Right. All right. She did not specifically say, can I . . . would you please let me use public transportation to do this? Would you please let me use the van service to do this? That didn't come up because the termination was so abrupt, and . . . I'm confused. I thought that they did provide some kind of accommodation, that she got an accommodation or agreement that she could have, and maybe I'm confusing, that she could have her sister or a relative or a neighbor drive her. Was that just to work, as opposed to these on-site visits? But I thought that there had been some accommodation made. Yes. She asked . . . she was going to have to do the field nurse shift on a Sunday, and she asked if her mother could drive her around, and Ms. Gutierrez said yes, that you can do that. So they made an accommodation. They said, well, you just go there, but it's okay, you don't have to drive there yourself, you can have somebody take you there. Right. But in firing her, okay, they say she always was a field nurse, but we believe that she was a team leader, so they fired her as a team leader, and they did not sit down and discuss whether or not can you go back to being a field nurse, because she had been doing that for . . . So the accommodation that you're talking about would be accommodating her not in her position as a team leader, but accommodating her by giving her her old alternative position. There were two accommodations we think they should have given her or at least discussed with her. One was, as a team leader, when she had problems with the computer because of her meds, and she asked for help. She asked for extra help with the computer to remind her how the programs worked and allow her to write down her passwords. So that's the accommodation she wanted as a team leader, and they did not . . . Taggart just walked away without discussing it with her and didn't do anything about it. And you're relying . . . your theory is that by not responding to her, that that's enough to show that they didn't make an attempt to accommodate her? As in Chevron Phillips, what happened is she asked for an accommodation, and they did not grant it, and they did not discuss it, and then they fired her, in part because she was having problems with the computer. And how much of her job as a team leader was working on the computer? A lot of it. A lot of it. They had evidently two software programs, one of which kept track of all the information about patients, like reports from the field nurses when they went to see them, and doctor's orders and things, and then another one which was scheduling the field nurses. How long had she been a team leader before she had the seizure? She became team leader in March, and her seizure was at the end of May. So she had been working at least two months, depending on how much of March she worked. Is there anything in the record to show how she was performing on the computers before the seizure and after the seizure? I mean, was this problem with, you're now a team leader, you have to work on computers, was she having problems from the start, or did the problems with working on computers result from the seizure and the medication? Do we have any evidence that shows us one way or another? Well, Gutierrez and Taggart testified, and one of the people who helped train her, testified that she was having problems all along, that she just wasn't, didn't learn how to use them properly and that she wasn't good at entering information accurately. All along as a team leader? That's correct. That's their testimony. But her testimony is that they never told me they had any problems with what I was doing, and therefore the jury could have inferred from the fact that she did not, there's certainly undocumented criticism of her before the seizure, and she testified that no one talked, no one criticized her verbally either. Well, if she, if they didn't have problems with her, why did she need, problems with her operating the computer? Why did she ask for help with a computer? Because after her seizure, the doctor put her on a heavier medication regime, and she, and that. Do we have any particulars about the type of help that she wanted? It seems like operating the computer was a major component of her being the team leader. What was her problem? She couldn't get the computer started. Did she need somebody else to run the computer for her, which is what she's supposed to be, I mean, I'm trying to figure out what is the qualitative nature. I'm sorry. Yeah. Her testimony was she was having difficulty remembering her passwords and remembering how the programs worked, and she, she wanted to be able to write down her passwords, and she wanted, and she wanted. She could write down a password. She didn't need their help for that, did she? I mean, I, well, it's not, there's, there's some testimony that they did, I think Gucciro did not want her to write down her passwords. They didn't want to tell her what a password was? They thought that it was against the company's confidentiality policies, that people had to memorize them and not write them down. So she wouldn't need an exemption from that work rule. Against their confidentiality policy. So a single employee has a password on a company computer and no one else knows what the password is? That can't be true. I, I assume their IT person knew, yes, but it, I mean, the record is not entirely clear on this. She, she clearly was able, she, if she didn't know them at all, she wouldn't have been able to work for those couple of weeks. And that, that's, that seems pretty clearly not what happened. She was getting, she was getting work done, but she was not getting it done as efficiently as she used to because she had problems remembering her passwords and she had problems remembering how the programs worked. And that was the accommodation she asked for, remind me, you know, give me, give me a, you know, just cheat sheet on how to use these programs. Ann? Did she make any specific requests for, for how to accommodate her or suggestions as to how you might be able to accommodate me? I'm really having difficulty with the medication I'm on. I need someone to be at my side to help me with my computer or I need a cheat sheet or I'm just not cut out for this, this job, put me back on, on rotation, visiting, visiting patients. Was there any suggested accommodations that might've come up, might've come from her? She testified that she wasn't, she wasn't, that she, she had suggestions and that, and that she wasn't allowed to give them, that, that she, she, she said to Taggart, her immediate supervisor, I need some extra help with the computer for a couple of weeks. And she testified that Taggart then walked away without responding to her and that she didn't feel like she was receptive to engaging in, in, in, you know, in talking about it and exploring that. So that, so that I, if there aren't further questions, I'll reserve it for now. Ms. Hall? Good morning, judges. May it please the court. My name is Jennifer Hall and I, along with Randy Patterson, represent the employer, LHC Group, in this matter. Just a couple of points that I wanted to respond to counsel opposite about as far as the timeline. I think it's always easier if we go from the start to the end. And so when Ms. Stone started with LHC Group, she was a field nurse. It is undisputed that an essential function of the field nurse position is that you travel to the patient's home to administer home health in the patient's home. The job description says that that requires a valid driver's license. It also requires that up to 50% of your day may be spent in travel. And so that is an essential function of the field nurse position. Does it require any computer work or is there a laptop where as you visit a patient you have to put down what's going on with that patient? The field nurse position was still very paper heavy at this time. So she would go in the morning to the office, get her assignments, line up her appointments, and then go and call on the patient. You're an isolated field nurse and maybe that's a good idea. Let's talk about field nurses. And you're saying it was essential and agreed that she'd be able to have a license and be able to travel to see these people. Now, I'm a little confused, would you straighten me out? I thought that there was an accommodation made. Maybe it just had to do with being a leader, but that there was an accommodation made that she could be driven by someone else to work. Did that include to make these visits as a field nurse? Right. At the time of her seizure, she was working more in the office, training in the team leader position. And in that position, the company would have most likely been able to accommodate a driving restriction. And in fact... As a field nurse or as a... As a team leader. As a team leader. Now, as a field nurse, was there an agreement, request for an accommodation, or any kind of understanding that she could be driven to her field nurse visits by someone else so that this question of having a driver's license and being able to go would have been mooted. It wouldn't have been essential. On one occasion, and we mentioned it... It was mentioned earlier on that Sunday, June 7th, her mother was allowed to take her to patient's homes. For the record, that was not approved by the home office. That could not be a long-term solution for a variety of reasons, including privacy concerns. And also, her mother's own position testimony that she has a full-time job and works for the United States Navy, traveling on boats to go map the ocean's floor. It's also important to note, under the ADA, LHC group was not in a position to take away essential functions of her job. So, when it was evident that she could not perform as a team leader, the only other position available would be a field nurse. And at that point, she was on a one-year driving restriction. And that driving would be an essential function. And the ADA does not require LHC, for example, to go out and hire a driver for Ms. Sands in that situation. But she didn't request a driver. She didn't request a driver. She had someone else who was going to drive her. So, she could get to the patient, right? Her testimony on that was she could have maybe used public transportation, which, as the district court said, there was minimal testimony on that, that there might have been a taxi in Picayune. Ms. Sands testified that she thought that there was a van that would come and pick her up and take her where she would need to go. Were all these home visits in Picayune, Mississippi? No, Your Honor. They're not. They're in Picayune, Poplarville, and Hancock County in general. So, you're going to be looking at rural areas. I know there was one case that the EOC cited in their brief that was out of the Northern District of Chicago when there was a fact question about whether they could use public transportation because you're in Chicago and there is a massive public transportation system. And that's not the situation here. Now, if we shift to the on-site visit, I'm sorry, my words are failing me, to the supervisor, the person that comes to work. Right. The team leader. The team leader. She could have been driven there. Yes, and she was. Her neighbor also worked for LHC group and was able to pick her up in the morning and bring her to work and bring her home. The other point of that is… What's your area there? What's your argument there that she wasn't qualified, that there's no evidence of causation? What is your argument as to where there's no fact issue with respect to something that either where she can't make her prima facie case or pretext? What is your… Two points, Matt. She was not qualified. It's undisputed through the record that she had problems with a computer. Before the seizure? Yes, Your Honor. She had confided in her mother that she was struggling with a computer. Okay. Now, we're talking about in general terms. What problems are we talking about? Sure. Basic typing, data entry. Also, things about being able to multitask. Can you answer the phone while you're still putting in an order and make sure that that order gets correct so that that patient is getting the right treatment? There were instances where she was having trouble with projecting and scheduling, which… She was having problems, okay? It's not… Shall we go on to the next stage, which would be what kind of an accommodation reasonably can be made with respect to those type of problems? Exactly. Where are you there? Again, with the team leader, there was the essential functions of being able to travel and drive to the patient's home if needed. That likely could have been accommodated, but the computer skills, the basic typing skills, the interpersonal skills, at that point, there really was not a way to find an accommodation to assist her. She testified that by June 19th, her memory problems were… Were these shortcomings as a result of the seizure and the medication? I guess I asked this before, but did she ask for an accommodation because of the seizure and the medication, or was this a problem that she had from the beginning that she couldn't work the computer, didn't have computer experience, and your company, the company you represented, promoted her when perhaps maybe she didn't have the qualifications for that job? I believe that is the situation. Kayla Wormser was already a team leader that was trying to assist Ms. Sones in being trained before her seizure, and Kayla testified that she was struggling to understand the concepts of the computer and what it was going to entail to be a team leader. In that connection, was she promoted to team leader, or was she being cross-trained for determination about whether or not she could become a team leader? The company's position was that she was being cross-trained. There had not been a personnel action form to change her from a field nurse to a team leader. Ms. Sones' position is, no, I was promoted, and there are emails in the record that would tend to support inference that, yes, she had been promoted. So from a government standpoint, she got it. She got this promotion. Right. And the district court noted whether she's a field nurse or a team leader at the end of the day is not a material question because she was unqualified for both positions. She cannot . . . And she was unqualified because she couldn't . . . she was so deficient in operating the computer, which was an essential part of that job. Yes. Yes. But it wasn't an essential part of the job of being a home nurse that went to make home visits. Right. But in that situation, being able to drive would be. And so she would not be able to perform those essential functions without LHC having to take away the essential functions of the driving. And you said her getting her own driver would be against regulations, and that could not be done if she said, I have my own driver to drive me around? Yes. That was definitely some concerns about privacy issues and whether she could do that and use public transportation effectively while maintaining patient privacy or having a driver. Take you to the next step on the home nurse. Let's say that there's a dispute about her being able to get to the location where the patient is. Did you assert a legitimate reason where even if she was qualified that her performance or something about . . . something that would show that you had a legitimate reason? Yes, we did. And what would that be, and what did you say? We were very concerned about the patient complaint from June 7th that said, you know, please do not send her back here. And Ms. Sones admitted that she was extremely tired and sleepy during that situation. Our expert, Dr. Ruth Fredericks, testified that in that situation when a nurse is under a medical condition that prevents her from effectively giving assistance and aid, then that nurse has a duty to refrain from the practice of nursing and should have gone on to medical leave. And that is something that was offered to Ms. Sones. She declined. We did want her to take some time off to get her medication straight, and she refused that. Was there some evidence that this medication was temporary until they stabilized her seizure issue, or was this evidence that this was going to be medication she would be taking for the rest of her life and could be affecting her . . .  . . . for quite a while. It was temporary medication, but as part of the process of what they call track trading up, they had gone up with her medications. It was coming back down. Ms. Sones' testimony was that her memory problems were resolving before the June 19th. She did testify, though, even at June 19th, she was still having problems with the computers. So we see that her memory problems are improving, but her computer skills are not. And then, I guess the next . . . We have some judges like that. And then the next step in the process of her termination was she was not at the office the Monday after that June 19th meeting, which was a call in. And it was unrelated to her own medical condition. That puts a hardship on LHC when its team leaders call in unexpectedly, because they are coordinating all the other nurses, the PTs, the OTs. And she was actually offered this medical leave? Yes, she was offered that. Was there a term of the medical leave, or until she gets better, or until the doctor is clear? I don't believe the record is clear as to if a certain time period was given, but LaLonda Brown, who is the director of HR, did offer her medical leave. And how about counsel's assertion that upon her request for an accommodation, that your agent just walked away from her? Ms. Tiger testified that when Ms. Stones returned to work, Ms. Stones provided the work release from the doctor that said there's no driving for one year, and she couldn't climb ladders. And Ms. Stones talked about that as well, that they kind of all kind of laughed about climbing ladders because she doesn't have to climb ladders. And that was really the extent of their conversation. Ms. Tiger did not recall Ms. Stones requesting help? She didn't recall it, but there was a dispute. In other words, the plaintiff does say that she asked for an accommodation. Right. And that was with respect to the computer and her password. But even if we were providing that accommodation, it would not get her to be able to perform the essential elements of that team leader position based upon her other lack of skills with multitasking and the computer skills. There's one— That's why I'm trying to figure out what her problem was with the computer, because if she says accommodate me and help me with the computer, and if that would have been a reasonable request, then you would have had to at least consider it. But you're saying, well, her problem was with the computer, and that was essential. So it sounds like you're at odds at whether her request for help with the computer is a reasonable accommodation, or whether the fact that she's even requesting it means that she's admitting that she can't perform an essential part of her job. It wasn't a memory issue. I mean, could she have written down her password? Yes. But we're talking big picture. She doesn't understand how OASIS and MISIS work in the computer. She doesn't understand how that software works. And that was a problem that was noticed and she was being trained on before the seizure. And she didn't understand it before the seizure. Yes. And she actually, Ms. Staines testified— And was there something in the record that tells us about the nature of that misunderstanding, or is it one of these general problems with the computer type thing that we've been getting? No. Ms. Gushereau testified to some more of the specifics, but now as far as written documentation prior to the seizure of what those shortcomings were, there is none. Did she have any written performance evaluation one way or the other? Not for the team leader position. She had written evaluations for field nurse and she was— They were all positive. They were all positive. They were. She was not even within the 90 days starting to perform as a team leader, so there had not been an evaluation yet on those performance problems or performance issues. One item I would like to draw to the Court's attention is that in the EOC's brief, there appears to be an argument that the prima facie case is three elements versus four elements. The EOC says she has to show that she was a qualified individual, that she had a disability, and then the third element was that she suffered an adverse employment action because of her disability. In the cases that we have cited and that the district court cited was the four-prong analysis, which breaks down that third element really into she suffered an adverse employment action and then she was either treated less favorably than a non-protected person or other— Well, the problem is it doesn't say or, it says and, and that's the problem. I think it's just a misstatement. It can't be and because either that third or the fourth one would be sufficient to get you into that threshold of a prima facie case. In other words, an inference that the reason that you were terminated is because of your condition or perception that you were—and that's the problem that I see in that case. And that's pretty far in the order of the cases that we've developed them, so they wouldn't have any precedential value in terms of which cases we decided first. It just seems—I think you stated correctly or, but the language in this case says and. Whether it's or or and, I think that that four-prong test is the one that should be applied in this matter and not the three-prong that the EOC would urge. The three-prong that the EOC urged I've seen more once we have gone past summary judgment and the McDonnell-Douglas framework really kind of goes away at that point. We're going to a jury trial and now the court is reviewing and that was what happened in the Rizzo case. Under the Shirley case that they cite, the employee there was a current drug user. And so under the ADA, he could not fall within the qualified individual because there's a specific exception, so there was no need to discuss any further, any other prongs of the prima facie case. And then in Dupree, they, this was a pre-ADA Amendments Act case and that turned on whether they were disabled. I think there are two cases that are unpublished decisions of this court from this year that are more probative and that would be Johnson v. Parkwood behavioral health systems in which there was absolutely no evidence on the fourth element and so summary judgment was affirmed. And then also the Cardiel v. Apache Corporation, which that case was also a failed drug test. He tried to assert that he was similar to other people who maybe had failed a drug test or had had an accident at work and the court found that no, those were not similar comparables. So that was that. The other case I would like to draw to your attention would be the Crossley v. CSC applied technologies, which was an unpublished decision in 2014. In that case, the employee was an aircraft mechanic and one of the essential functions of her job was to be available to travel as needed. She was not able to travel because of her appointments for treatment for PTSD and the court held that she was not qualified, she was not a qualified individual because travel was the central function of her job similar to both the field nurse and the team leader position. Are there not any other questions? One question. You said that part of the driving, there was some privacy concerns and therefore she could not get anyone to drive her. But where is the privacy concern? I mean would the driver stay outside and wait for her while she goes inside and sees the patient? Are you concerned that the driver is going to be inside and listen to the patient nurse discussions or where is the privacy concern? I believe the privacy concern is when you are going to individual homes that the driver would know who that patient is. Yeah, just knowing who the patient is. It's their house and so you would know that they are receiving some type of medical treatment. Okay. Thank you. Thank you. Okay, Mr. Remshaw. The testimony is they testified they offered leave and someone testified no, they never discussed leave with her. So on summary judgment that should be the factual stance. The privacy concern with having another driver, again, there are two things there. One is that, as we've already mentioned, Gushiro allowed her to have another driver around to the patients. But also both job descriptions allow the person to use public transportation. They say by car, by private car or public transportation. So is there a privacy concern? Certainly not established, no. Not on this record. If someone drives you straight to the house, maybe there would be, but would you tell the taxi to drop you off two blocks from the house or something? Yes. That's another possibility. Counsel, what do you do? I'm sorry. I'm sorry. Let's assume there is a taxi in Picayune, Mississippi. Yes. There is one? She testified that there was a van service. What kind of service? A van service. A van service. That you could call and it functioned like a taxi, except there might be. If we go beyond that, with reference to going to homes, not the supervisor or team leader, what do you do with their assertion that there was complaints from a patient that she didn't want to see this person anymore because she didn't like the way she was performing her job? Has that been disputed? No. We don't dispute that a patient complained to Lee and Lee told Taggart about that. But she had worked a couple of years satisfactorily as a field nurse. Presumably you don't fire someone because one day they've got a problem. Her medication was being adjusted. She asked her doctor, she said, I'm too fuzzy or whatever, can you cut down my meds? And the doctor did before the 19th. And that's why counsel talked about her problems starting to resolve. In connection with the fourth prong, the commission entirely agrees that the commission has to raise an inference of discrimination by showing pretext, if not another way. And the commission believes it did that here because from looking at the record from the commission's point of view, she was made team leader, she worked as team leader for a couple of months, and they didn't criticize her. They talk about her having these fundamental problems all the way along, but her testimony is no one ever told me that, and nothing was ever documented. And then after she has her seizure, suddenly she gets this severe criticism, and as a result of that meeting they say, okay, you've got six weeks now. And then five days later they fire her. And her testimony about how they fired her was not that they talked about these performance difficulties, the driving restriction. She says it was a one-minute conversation, and they told me they had to let me go because there was a liability to the company. Given that evidence, a jury could find that the termination was based on her disability and not on the performance problems. And in terms of allowing her to go back to a field nurse position, there's no testimony that sat down and talked with her about, okay, well, is there some other way you can get to the patient's homes? And she says, well, this did not happen, but they could have talked about the van service, how far the van service reached, whether she could be assigned to patients where the van service provided transportation. No further questions? Thank you. Thank you, Mr. Ramshaw and Ms. Hall. And court will be in recess until 9 o'clock.